Good morning, Mr. Clerk. Could you call the case, please? Case number 1130, State Bill 3, is in re the Commitment of Reginald Dodge. If counsel who are going to argue would approach, tell us who you are and who you represent. Good morning, Your Honor. My name is Daniel Coyne. I represent Mr. Dodge. Your Honor, my name is John Schleppenbach from the Attorney General's Office on behalf of the people of the State of Illinois. Okay, the usual rules will apply here, which are 15 minutes per side. We don't have a case after you, so I don't know that we're going to be hammering you on the clock. But save some time for rebuttal. The microphone there is for recording purposes, not for amplification, so keep your voice up so everybody can hear what you have to say. Okay? Thank you. Please proceed. It's nice to see you, Mr. Coyne. Just for your edification, I can tell you at the beginning we've all read the briefs and we're familiar with the arguments you're making regarding chronic standard and the or chronic, however it's pronounced, and the Strickland standards. So if you want to go into the meat of the argument rather than give us your comments on the existence of the two standards, we can shortcut your presentation. I could do that. Okay. Thank you. May it please the Court. I'd like to reserve two minutes for rebuttal. On September 19, 2011, Mr. Dodge went to trial in an SVP commitment proceeding. He was entitled at that time to effective assistance of counsel. Instead, what he did receive was counsel that conducted no meaningful voir dire at the beginning of the trial. In fact, the trial court remarked at the end of jury selection that he was appalled in a good way and flabbergasted and happy that they were able to get a jury so quickly. He received an attorney that an opening statement said, and I quote, Mr. Dodge has a horrendous background. He's done 36 years in the penitentiary. He began to lay down his defense, which apparently was an age defense, that Mr. Dodge would not reoffend at the age of 60 or above. He did tell the jury that for someone who's 60 there are no statistics saying anyone has ever reoffended. The evidence proved later that that was untrue. However, Mr. Dodge was only 56 at the time, so it was really no defense at all. He then did something that not very many defense attorneys would ever do. He promised the jury that his defendant would testify. He told them that Mr. Dodge will testify. He'll give you an idea of what he's like. You'll get a good feeling for him. And at the end, he told the jury that they would have reasonable doubts, especially since Mr. Dodge isn't receiving any treatment, sort of a nonsensical thing to ask the jury. Thereafter, what followed was a trial which consisted of what the Attorney General's Office has defined as largely uncontroverted and uncontested evidence. And that's indeed what took place, and I can return to that in a few moments. The closing argument was just as problematic as the opening. The defense appeared to be one of jury nullification. He told the jury to consider whether it's the right thing, the fair thing, to do to commit him. Trial counsel did not address the elements of the case. He did not even mention the burden of proof. He simply said enough is enough. It's time for him to go home. After the closing, there was a jury deliberation that lasted approximately 20 minutes, and the jury came back with a finding of an SVP. In an SVP case, as the Court knows, there is no sentencing. There's what's called a disposition hearing. Mr. Dodge was entitled to a disposition hearing. He did not get a disposition hearing. The trial court asked the judge, I'm sorry, the trial court asked Mr. Dodge's counsel whether he had a position on whether they could have an immediate disposition hearing. And there was no answer from the trial counsel. It just simply, the record is silent. It's as if trial counsel did not know what was supposed to happen. You know, the other thing that strikes me as being silent is any suggestion that there's any other evidence that would provide the defense counsel with any ammo, so to speak, to argue either to the jury that he is not a sexually violent person or to try to persuade the judge in a more meaningful disposition hearing. We don't have any suggestion in any of the arguments before us. There was nothing in front of the Court to indicate that there was some kind of different evidence or more persuasive evidence. What's your position on that? We're sort of constrained by the record at this point. Right. If this were a crankle hearing or if this were a post-conviction hearing, we'd be able to supplement the record with what that evidence would have been, what it could have been, how things should have been done. But with the record standing before us as it is, we're not really able to introduce that evidence. I can't say that with regard to the Section 40 hearing, there are specific requirements that a trial court has to consider before coming to an opinion that the individual should have secure treatment as opposed to conditional release treatment. There was no attempt by the trial counsel to introduce that evidence at all, and that evidence would have come from requesting a predisposition evaluation, and there was no request for a predisposition evaluation either. Didn't the Court already hear evidence and the jury hear evidence that this man had actually refused treatment, hadn't had any treatment at all? They did hear that. There is no obligation to have treatment pre-commitment. It's as if an individual is being held in Cook County Jail and wants to come out and he can't come out. He's not required to stay there if he can post the bond, even if it's a terrible case and if the presumption is great that he's going to be convicted. The same thing with regard to treatment. You're not under any obligation to seek treatment before you get out. And in fact, seeking treatment, as part of this panel I'm sure knows, is counterproductive to trying the case, because the first step in treatment is full disclosure of everything that happened, not just in the matters that are the precursors to the SVP petition, but in anything that you did ever in your life. That information then comes in at trial. So it is completely counterproductive to intertreatment before you go to trial, because essentially what you're doing is giving the prosecution more evidence. It's a hobson's choice. It is. Can we go into some of the specifics of the claims of ineffective assistance of counsel? We may. I'd like to first discuss with you the voir dire issue, because it's a fairly self-contained issue. Now this is a situation where in the voir dire, two of the jurors offered that they had some insecurity about their facility with the English language, which those of us who have tried a number of cases realize is within the litany of things that are raised by some reluctant potential jurors sometimes. I thought one of the interesting things was one of the people who said he wasn't proficient in English used the word proficiency, which is not exactly pidgin English. But in any event, neither side moved to either challenge those witnesses or use a cause challenge on them. And it seems to me that it's difficult, and I'd like your view on this, to ascribe anything other than trial strategy to that, because it's often the case where it's often said that you don't select a jury, you deselect a jury, you have a certain number of peremptory challenges. And a lot of people have the philosophy that you should not waste those on followers, that you really need to keep those arrows in the quiver for potential leaders who could be troublesome to you. That's correct. And in many circumstances, trial lawyers on both sides have said, well, you know, I'd rather have an effective jury of ten people than use a peremptory challenge on two people who might not hear and understand everything that is being said. And that would seem to me to be a quintessential trial strategy reasoning. Can you tell me why I should look at this differently? Well, I think that if we're talking about Vaugier, the court has to look at it in its entirety. The fact that there was only one challenge exercised by trial counsel, and that was for an individual that had, I believe it was a friend that had been sexually assaulted that she was very close with and would not, she said she would not really be able to, I believe the language was, I don't know if I could be fair knowing that. So there was a challenge exercised on that. There were, I believe, seven challenges that were exercised for cause, and those were brought to the trial court's attention by the State. Each and every one of those people said they didn't think they could be fair because of some other preconceived ideas about either the case or some other connection to the criminal justice system. One of the things that was most interesting in the Vaugier, in addition to the language difficulty, was that there were no questions posed by trial counsel at all to the panel. A question that probably would have been helpful would have been, Mr. Dodge is going to come before you convicted of a number of sex offenses. Knowing that, can you be fair? That question was never asked. And can you point me to any case law precedent where the failure to ask that type of a question is found to be ineffective? I think the Court knows that I cannot. Well, if you could, Mr. Coyne. It's not the first time. If you could, Mr. Coyne. I've heard it before, too. You probably would just show once again that you're a very careful researcher because I just am not familiar with any such case. There is no case that any court has reversed with regard to simply Vaugier questioning. However, as the Court knows, under McMillan, you can take the entire trial into account, start to finish. And that is something I think that the Court needs to do when it's considering whether or not there was deficient performance and whether or not there was prejudices resulting from that deficient performance. I cannot argue to you in good faith that I think that Vaugier was a chronic error. There is no law to support that. Turning to the rest of the errors that we identified in the brief, one of the most egregious would seem to be allowing the worst of the worst argument to come out in front of the jury. That particular argument has been roundly criticized by other states that have heard it. One other state in Kansas reversed a case partially in light of that saying you just can't put out there that this individual is the worst guy you will ever see. You can't do that. You can't introduce that kind of evidence. It runs afoul of Rules 401, 402, and 403. It is simply irrelevant to anything going on. And there was not even an objection. There was not a motion to eliminate to bar that evidence. And you're referring to the fact that the only interview screened 2 percent or 4 percent. It's a winnowing process. They originally look at perhaps 1,000 to 2,000 cases a year. Then the funnel gets smaller and smaller and smaller. And then at the end we ended up with Mr. Dodge. And what it connotes to the jury is clearly that this is the worst guy you're ever going to see without even any evidence. And you saw the attempt of the state. They did hear plenty of evidence, though. They did hear plenty of evidence. Again, the evidence that they did hear, a lot of that is all basis of opinion evidence, not to be taken as substantive evidence at all, just for the reason that the experts came to their conclusion. And that evidence was not challenged by trial counsel either. There could have been questions such as did you reach any primary sources? Did you talk to a victim? Did you talk to a police officer? Did you do any research on this? And those questions simply weren't asked. There was no action on the part of trial counsel that subjected these facts to any kind of meaningful adversarial testing whatsoever. The evidence I was sort of alluding to was more just the fact of what he was involved with that led to all these numerous convictions. That's correct. That's not admissible as substantive evidence. And there was a cautionary instruction that was given to us by Judge McHale before the testimony of both of those experts, Dr. Arroyo and Dr. Smith, and there is a conclusory jury instruction telling them that this is not substantive evidence. Perhaps trial counsel could have reminded the jury about that in closing. He did not. In fact, he sort of capitalized on that in opening. He just said he served a whole lot of time. And in closing, just let him go home. It was not an effective opening. It was not an effective closing. There was nothing effective in the middle, specifically the selection of a defense of he's too old. It was a non-defense. It's not a viable defense. If we accept that it's ineffective, just for the sake of our discussion this morning, what about showing us some way that this was prejudicial to Mr. Dodge? And that only comes into play, of course, in the Strickland analysis and not in the Kronick analysis where it's a per se standard. Right. Turning first to the Strickland analysis, prejudice is usually demonstrated, as the Supreme Court and the appellate courts in Illinois have said, where a theory of defense leaves a jury with no alternative but to convict in a criminal case. And I would suggest to the Court that the same standard would be present here. If the theory of defense is no theory, if the jury is left with nothing at all, then there is clearly prejudice. They have no alternative if they adhere to the jury instructions, which they are presumed to do. But to follow those instructions and then make a finding that he is an SVP. If trial counsel does not understand the law, that is sufficient prejudice. If he asserts an incapable and unviable defense, that is sufficient prejudice. And those are the prejudices that we have had here. In addition to that, Mr. Dodge continues to remain in the treatment and detention facility. And when it comes to the disposition hearing, there was no disposition hearing of any kind. Yeah, we'll get to that. That's another issue entirely. Could you talk to us a few minutes about the lack of a transcript of the deposition and what impact that had on this case? Well, apparently, and again, because we don't know, there is no record, apparently trial counsel began to impeach Dr. Arroyo. And that would be important. But he said he didn't. Well, the record indicates otherwise. The record indicates. I guess if you'd focus on that for me, Mr. Coyne. I'm curious because obviously, as you alluded to quite correctly earlier on, you can't bring in something that isn't in the record. So we don't know, even if you know, what would be in that transcript. But you were suggesting that there was something in there that would have been helpful had he attempted to impeach without any evidence of that at this stage of the proceeding. And what we have is the statement that I think the state quotes in its brief where he says, I'm not trying to impeach. It almost is a suggestion that it's a preamble to further discussion of that issue without the availability of something that is impeaching. And that, of course, even puts aside the issue of why, without a transcript, you're not able to confront someone with a prior inconsistent statement if there is such a statement, which is not mentioned by anybody but did strike me as rather curious. But if you'd like to address that. Well, I think what we need to do is just back into that a little bit. There are only two witnesses, Dr. Smith and Dr. Arroyo. And the DHS evaluator, he had the wrong standard when it came down to much more likely than not. So there was something to argue with regard to his credibility and his expertise. Dr. Arroyo, on the other hand, was largely unscathed through cross-examination or direct examination. So it made it all the more important that if there was something to impeach him with, that that impeachment would be perfected, that that question would be asked. I cannot tell you what the deposition transcript said. There is no deposition transcript. The lead-in questions the trial counsel posed to Dr. Arroyo were textbook questions on how to perfect an impeachment. The question about didn't you say in your deposition. And it was about the issue of age. Without knowing what it was that he was going to follow that up with, the record being silent, all we're really left with is the fact that was it ineffective not to be able to perfect that impeachment. So we are to presume for purposes of your argument, if I understand it, that he was trying to impeach, that there was an impeaching statement in the record, and that that impeaching statement in the record, at least for Strickland purposes, would have, the failure to impeach there would have been prejudicial. That's correct, because that would have been the only prejudice that you could find in the record, not counting trial counsel's inability to cross-examine or unwillingness to cross-examine. The cross-examination in both of those witnesses, if you look at them, if you take out the squabble about whether or not it was an impeachment, cross-examination for both of those highly technical, highly professional witnesses runs about four pages. And never does the cross-examination attack the diagnosis. Never does the cross-examination attack the standard of substantially more probable than not that he's going to re-offend, except for focusing on something that was nonsensical. That nonsensical thing being that if you're over 60, you're not going to re-offend, but the respondent isn't over 60. But where is the evidence that counsel should have presented? I mean, is there anything in the record that would give us something to rely upon that counsel was deficient in not presenting evidence, in not making an argument based on information that he had available to him? I think the only thing that, because the record is silent, again, we're in an awkward position here as far as introducing new evidence, but because the record is silent, we have to rely on your honors to say, what would you have wanted to hear if you were the trier of fact? I can give you some examples of that, although these aren't in the record. For example, the actuarial instruments. Were those actuarial instruments peer reviewed? Have they been tested for validity? He could have elicited the evidence that those actuarial instruments are as good as a coin toss. He never did that. This is all information that you would be able to find if you just looked at any website talking about those actuarial instruments. He could have also elicited, with regard to the diagnosis, your honors I'm sure noted that in the record there were two clusters of offenses. One of them in 1974 and one of them in 1982. Each of those clusters, the first one was within 30 days in 1974. All those offenses took place. In 1982, they were within 10 days. All those offenses took place. Even a layman's reading of the DSM-IV would tell you that when you looked at the diagnostic criteria and did differential diagnosis, that's indicative of some sort of a psychotic break. Those questions could have been asked. There is no stretched out period of time from 74 to 82 where there is an offense and then a couple months later another offense. Would you refresh my recollection as to where he was between 74 and 82 and where he was afterwards? He was in the penitentiary for a large part of that time. But the clustering of the offenses isn't belayed by the fact that he was in custody. He could have had those offenses stretched out, but instead he went out and immediately clustered all of this stuff together. And from a diagnostic perspective, and the ability to cross-examine on a diagnosis in front of a jury, that would have been very relevant. Isn't it a fair reading of the record before us that there was clustering, as you say, of this activity, arrest, imprisonment, release, clustering, arrest, imprisonment? That's correct. And there's no dispute as to that. But the question in SVP proceeding is were those offenses the product of some sort of a mental disorder that was sexual in nature, some sort of a paraphilia? Or, on the other hand, was it the product of some sort of a psychosis? And that's the crux between those two. Other than coin and psychiatry, where's the basis? I used to use the DSM-III in cross-examination, too. But, I mean, other than your ruminations, what do we have to rely upon? There is no evidence that I can give you to rely on because it's simply not in the record. So basically you're telling us that this lawyer was just not well-prepared. He was clearly not well-prepared. So this is the generic ineffective assistance of counsel. I don't really believe that I can in good faith argue to you that there's a generic ineffectiveness, but I can point out specific places without having to rely on coin and psychiatry. For example, what is it that this court would have liked to know about this cross-examination? You can come to that conclusion. You could look at a cross-examination and, in your collective wisdom, you could say, this was deficient because some of these questions left me, as a trier of fact, questioning what happened on direct. Why weren't these questions asked? And it doesn't have anything to do with knowing what the record was, just a question of what happened. One example would be the redirect examination of Dr. Smith. In that redirect examination, the question was about remorse. I'm sorry, the re-cross-examination was a question about remorse. And trial counsel said, so what you're telling me is that after 32 years in the penitentiary, he has no remorse. And the doctor said, that's right, he has no remorse. Where is the effectiveness of cross-examination with that question? It does nothing but highlight what the doctor said that was antagonistic toward his position. Let's move, if we could, given the time, to the question of the, quote, meaningful dispositional hearing. If we don't go your way on the ineffective assistance of counsel argument, you throw in at the end that we could remand for a meaningful dispositional hearing. What's the legal basis upon which you would suggest we could give you that? That would be the Fields case that's recently been decided by this Court. A disposition hearing under Section 40 requires several things. It requires that not only that the respondent have a mental disorder, it also requires that arrangements are available to make sure he's got access to treatment, and that he'll participate in treatment after a finding. That evidence was not before the Court at all. That's what would be put forth in a dispositional hearing for the Court to say, I'm just going to consider the trial a dispositional hearing, when those two elements can't be admitted during the trial because they'd be improper. They're not relevant. And there was even There was a motion to eliminate. There was a motion to eliminate where the judge said this is for the dispositional hearing, which you argue never really occurred in any meaningful way. That's correct, because the evidence that the State was seeking to preclude from coming in at trial was just that evidence. You can't have it both ways. You can't preclude the evidence from coming in and then say the Court had that evidence. That's just not appropriate, and that's not what happened here. So without those statutorily mandated factors being fulfilled by the Court, without the Court considering those factors, it was not a disposition hearing. So the record at this particular point is, I would submit to the Court, just replete with evidence that there was no meaningful disposition hearing, and that was our request to send it back for a dispositional hearing. Turning briefly to Cronick, Cronick is a standard that is rarely applied in Illinois. It has been applied in Hattery, and I know the Court is familiar with Hattery. I watched the closing argument of First Hattery. I think we both did. And it's also been applied in Kozlowski. The facts of Kozlowski are very similar to the facts in this case. In Kozlowski, the defense raised was a consent defense in a case. The victim, however, was underage. Consent was irrelevant. And the Illinois Appellate Court said in that case that it's simply a Cronick error to assert a defense that cannot prevail as a matter of law. I'm sorry. No. So with regard to Cronick, I believe that we have raised a sufficient Cronick argument for the use of an inappropriate defense, a defense that could not ever succeed. Age? I'm sorry? Because of the age? Because of the age. Right. Not only was that defense unviable from the very beginning, but the evidence from both of the doctors that testified was a flat-out no. Isn't it true that no one offends after they're 60? No, not at all. They offend at a reduced rate. If Hattery is the main example, of course, we don't have anything approaching the Hattery situation where the lawyer stands up in closing or actually in opening statement and says, my client is guilty without entering a guilty plea or having any of the admonitions of the guilty plea, which was the linchpin of Hattery. Well, that's correct. And the Cronick standard that was adopted in Hattery was the failure to subject any evidence to meaningful adversarial testing. And I would point out that in this particular case, as I mentioned earlier, even the State agrees that there was uncontroverted, uncontested evidence here. In their brief at page 28, that's how they characterized this trial. I would agree with that. It's one of the few things in their briefs I do agree with. It was simply not contested at all. And that's why it brings us over into a Cronick standard. Finally, a few of the other errors that the Court can consider, generally speaking, there would be a motion for a directed finding made. It was clear that there wasn't until the next day when it appeared in the record that someone may have said, hey, do you want to make a motion for a directed finding? Of course, though, with the evidence having come in, and I understand you're arguing with more centrally the lack of a meaningful cross-examination. With the evidence and the conclusions that came in, a motion for a directed finding was really just a procedural step that had no meaningful opportunity for success. That would be true. But that turns to Justice Paczynski's question about was there simply a massive lack of preparation, an inability to do this. And I would say that that's another point that does show a lack of either preparation or an inability or simply not knowing how to try this sort of a case. This is not a criminal case. And while trial counsel may have tried hundreds, literally thousands of criminal cases, that's not what this was. The argument that a jury nullification should be an appropriate defense, again, is an unavailable defense, improper, and essentially that's what they said in Kozlowski. Now, a jury nullification defense, though, sometimes is all that one has. And the argument can't be that it's per se ineffective to try to use a jury nullification defense. Your argument is more that under these circumstances, it would be inappropriate and ineffective to use a jury nullification defense. Specifically because there were other things that could have been gone into during the trial with an effective cross-examination. One other factor is trial counsel never asked the doctors about some of the things they knew and could have brought up, like protective factors. Trial counsel could have asked about the various protective factors that would keep Mr. Dodge from reoffending. He did not, except for the 60 years old. I'm sorry. He didn't get the doctors to describe more likely or much more likely, either, did he? No. And I believe my suggestion to the Court would be that trial counsel didn't know the case law that defined substantially probable as much more likely. Had he known that, he could have developed that line of cross-examination, tied it together with the protective factors that were available, and made a credible argument in closing. Separate from the question of whether counsel was ineffective, are you suggesting here that the trial court itself was improperly denied the defendant a meaningful dispositional hearing? If that error were preserved, I would be saying that. It was not preserved in a motion for new trial. There was no objection by trial counsel,  I believe that the Fields decision clearly addressed this particular issue. Even with a plain error analysis, you could argue that this is a fundamental structural problem to not have the dispositional hearing, which would waive the issue or eliminate the issue of whether it was preserved at trial. We could. There is still some open area to be completely forthright with the Court as to whether the civil plain error standard or the criminal plain error standard applies here, and the tension between those cases. It would seem to be a good time to argue that. Having heard the Court say that, I would say that the trial court certainly erred just on its own by not knowing or not wanting to engage in the disposition hearing, or perhaps not wanting to continue it for that dispositional evaluation. Or, to be candid, the phrasing of the statute seems to suggest, when it talks about the option of the judge to ask for an evaluation, it could be misread by somebody who hadn't done a lot of these cases into saying that it really is the option of the judge whether he needs any more information before deciding the disposition. And as I read the record in this case and the briefs, it occurred to me that might have been the problem. Well, that could be the problem, but the statute goes on to say there are mandatory things to consider. Right. And that confusion may be ameliorated by the statutory direction to consider some things. Some other confusion that courts have encountered before is outlined in the Teitelbach and the Winterhalter case. But in both of those cases, all of the statutory information came in, albeit erroneously, during trial. And so the court did have that information during trial in those two cases. So, in conclusion, I would say that we would ask the court, first of all, to remand the matter for a fair trial where Mr. Dodge would receive effective assistance of counsel. Falling short of that, we would ask it to be remanded for a meaningful dispositional hearing pursuant to Section 40. Thank you. Thank you. Thank you. Your turn. Thank you. You've been very polite during the last half hour. Now we'd like to hear from you. Great. Again, I'm John Schlachtenbach from the Attorney General's Office on behalf of the people of the State of Illinois. And in this case, Respondent's claim of ineffective assistance of counsel should be rejected for two main reasons. First, because Respondent is unable to identify any prejudice from his counsel's actions. And second, because counsel provided adequate, effective, and competent performance. Well, the first one only applies to the Strickland standard, though, right? That's correct. Should this Court decide to apply the presumption of prejudice from the Kronick and Hattery cases, then obviously Respondent would need to show prejudice. This Court should not do that, however, because this is not the sort of case for which Kronick was designed. In Kronick itself, the Court recognized that that presumption would apply only in cases where counsel's failure to test the case adversarially was complete. In fact, Kronick did not apply the Kronick presumption. And the Court subsequently, in the Cone decision, clarified again that Kronick applies only where counsel's failure is complete, where the challenge is instead to discrete actions of counsel that are best evaluated in the context of the facts of the case to see what sort of effect they may have had on the trial. Then the traditional test of Strickland v. Washington applies. Those are the sort of errors that are raised here. Things like — But I think his argument here is that you look at the totality of the purported errors and the failure to challenge directly any of the conclusions or even the methodology used by the witnesses in reaching those conclusions and that, therefore, you get to the Kronick per se. Your Honor, Kronick or Kronick, I'm not sure how it's pronounced. I have no idea. Don't know the joke. Yes, never met him. But that refers to the — not the number of errors, but the type of errors. In Kronick, the errors identified that fall under that standard are errors of such a type that it could never be effective professional representation. Being absent for parts of the trial, there's no way that that counsel is effective, that there's not prejudice. If counsel has a significant conflict of interest, those are the sorts of cases you can — You can look at Illinois cases applying the standard and see situations where counsel failed to conduct any cross-examination or to make an opening or closing argument or the case that Respondent has relied on, People v. Kozlowski, where the counsel relied on a defense that was unavailable for the defendant to defend. And in Illinois, that's the case. I do want to point out that that is not the situation here. Counsel — Respondent has argued that his counsel misunderstood the law. That's not clear from this record. What he points to as evidence of that alleged misunderstanding are statements by other participants in the trial that counsel simply failed to speak up and say, oh, I think that's wrong. That wasn't the situation in Kozlowski, where the attorney made multiple statements on the record suggesting that he believed that consent was a defense to an aggravated criminal sexual abuse case and, in fact, was corrected by the judge on a couple of occasions and persisted with, as his sole defense, something that was not a defense. Now, here, although the defense that Respondent was old and unlikely to re-offend as a result did not work, it was a valid way of challenging the fact that the State's  If I understand your argument, it's although the theory that he was using based upon the perception that 60-year-olds, they had no evidence that 60-year-olds re-offended, that he had somebody near the age of 60 and he was trying to use that as a hook to suggest that this person didn't have a substantial likelihood to re-offend. Yes. And he actually did that quite effectively. If you look at the cross-examination of Dr. Arroyo, he got Dr. Arroyo to make two significant concessions. First, that there is a certain significant age for offenders after which they are less likely to re-offend, that that age is when they have 15 years or less. Which seems very peculiar to me, but that's an aside. I'm not a psychologist, but it seems peculiar. How does one know when one has only 15 years and no more to live, and how does that change the way you're going to behave if that occurs when you're 45? I hope none of us in this room are in that circumstance without knowing it. But regardless, it was an effective way of establishing that it wasn't just a matter of being 60, it was a matter of being old. And that effectively undercut the state's case, and indeed he got Dr. Arroyo to admit that having made no calculation himself of Respondent's likely life expectancy, he could not say whether Respondent had reached that certain significant age after which he'd be less likely to re-offend. So that did put some doubt into the minds of the jurors. It did undermine the state's case. Not enough, given that there was ample other evidence, but it was an example of what was an effective strategy for counsel in light of the very, very difficult case and the difficult record he was dealt. And that's also why there's no prejudice in this case. If you look at the state's evidence in this case, it is really quite significant. As your honors no doubt know, the three elements that the state needs to show were amply shown here, the four prior convictions which were all introduced. We've conceded that's not an issue. Great. So the evidence was very ample here. There were the two diagnoses, and both opined that he was substantially likely to re-offend. And in light of that, Respondent needs to show something that would say there could be a different result here. There is an argument that we could make that Respondent was not a suitable candidate or that Respondent was not an SVP or that Respondent was a suitable candidate for conditional release. Would you care to address the issue that we left off with Mr. Coyne about on the dispositional hearing or what is purported to have been a dispositional hearing? Certainly, Your Honor. Well, the trial judge did have a dispositional hearing. He characterized the proceeding as a dispositional hearing and concluded He only characterized the, in basically one sentence, and didn't ask anyone whether they had any evidence to present at such a hearing. Yes. So it was a hearing where, and I'll use the word hearing because you're claiming it is one, where he starts the hearing by saying, I've heard enough. Yes. I'm ready to make my decision. Yes. And then not even, which is a problem in and of itself, I think you could concede, or not. I believe that because the judge had substantial evidence from the course of the trial proceeding in order to assess the dispositional factors and make his determination. How is a hearing possibly fair where the judge not only thinks in his mind, but expresses to the lawyers that he has heard sufficient evidence and he knows what he's going to do in essence before he even asks the lawyers, which he didn't ever get to, whether they wanted to introduce any evidence or have any argument? There was a motion in Liminate where the lawyer for the defendant or for the petitioner, I guess he's a respondent, was said, told by the judge, that's for the dispositional hearing. Yes. So he says, you can't introduce this evidence at the trial. It can come in, impliedly, at the dispositional hearing. And then he doesn't, he says, I've heard enough, and he doesn't even ask whether the person wants to introduce any such evidence at a dispositional hearing. Isn't that bothersome to you? Well, during the course of the trial itself, there was ample evidence adduced that was relevant to the dispositional factors, and that evidence was tested by Respondent's Counsel. So the Court had heard a lot of evidence that was relevant to the nature and circumstances of the behavior at issue. Would that be the standard, if you've heard a lot of evidence, when the lawyer is not asked whether he has any additional evidence? Well, he was, the lawyer was given the opportunity to make a statement. He did choose instead to ask for a date for the motion for new trial. Was it really an acquiescence to the statement by the judge that he had heard enough evidence and basically he was ready to rule? I believe that it was, yes, an acquiescence to that statement. And, indeed, that was. Was that troublesome? I don't believe it's at all troublesome in light of the law at the time, because he, there were two decisions of appellate courts in Illinois that suggested it was appropriate for a court to make the dispositional determination based on the record before without granting a continuance to present additional evidence. And it was reasonable, especially for a counsel, to rely on those decisions and to not insist on a continuance for a dispositional hearing. Now, of course, the issue of whether a dispositional hearing was needed is not before this Court. That has been forfeited. It's been raised for the first time at today's argument. Well, it really is not raised for the first time in this argument, because if you look at the prayer for relief in the opening brief by the appellant, they ask for a remand for a meaningful hearing. Now, I understand it's couched in terms of ineffective assistance of counsel. Yes. But the question is, do we look to see whether this is a structural flaw in the conduct of the proceeding, and do we use that standard? And, if so, is this one? And can we reach it through a plain error? Your Honor, the issue before this Court is the ineffective assistance of counsel issue. And because counsel could not have been clairvoyant and predicted that he had a basis to insist on a continuance, counsel was not ineffective for not doing so. And, furthermore, there's nothing in this record to suggest that there was any evidence that could have been presented at a continued dispositional hearing to show that Respondent was not appropriately sent to secure confinement as opposed to conditional release. Especially given the fact that he did suffer from a mental disorder, that he was substantially likely to reoffend, and that he had not sought treatment and, in fact, did not believe that he needed it. All of that evidence came in during the trial and was subjected to the possibility of vigorous cross-examination and was in the record. So there was plenty of evidence there. And there's nothing in the record to show that there could have been a different result. And that's the burden here. Wait a minute. What about when the judge said that the opinions regarding secure care versus conditional release actions are for the dispositional hearing, and then the judge did not do that on his own, and the trial counsel didn't jump up and say, Wait a minute. Wait a minute. We were supposed to get back to this for the dispositional hearing, and I want to do that now. Counsel has said you can't have it both ways. You can't keep it out and then say, Oh, it's in. Well, Your Honor, first of all, it was an entirely reasonable decision for the court, based on the law at the time prior to the Fields decision, to determine that it didn't need to have a dispositional hearing because it had enough information. As to the evidence, we don't know what that evidence is. Isn't that the same? Is it even reasonable where you have somebody near the age of 60 or who will quickly reach the age of 60, maybe before this whole litigation process is over? I don't know. I hope not. And have that as a consideration on what type of confinement or disposition would be appropriate. So even if one didn't have to have that dispositional hearing based upon his condition, is it reasonable in the context of this case with somebody nearing the age of 60, given what was heard from the two witnesses at the trial? I think it's reasonable exactly in light of what was heard from those two witnesses at the trial. Given the testimony of those two witnesses, it was clear that Respondent should be in secure confinement and not under conditional release. As the judge expressly found, when someone has a mental disorder and resolutely has not sought treatment, secure confinement is the appropriate disposition. The court did have enough information to make that decision, and it made the decision. I think in this case, the evidence was sufficient, and what's more, there's nothing in the record to show any evidence of anything else. There's not even a theory that's been presented under which Respondent should not be put in secure confinement. There hasn't even been an argument presented, a legal argument, an appeal to the emotions as to why this Respondent should not have been put in conditional release. It's their burden. I understand that, but, you know, we did have a colloquy with Mr. Coyne both about the issue of what you can put in the record when you're doing an appeal based upon ineffective assistance of counsel as opposed to a post-conviction in a criminal case where you can actually create a second record. And so we're left with whether there is substantial unease about the procedure that was employed in this case given the facts that were adduced at the hearing and the procedure which was applied. Your Honor, respectfully, the standard for ineffective assistance of counsel shouldn't change based on the Respondent's failure to make a record. There are ways to make a record, to make an offer of proof, to seek a hearing. If the lawyer was confident. Well, there was a new lawyer appointed right after the hearing, and there was no effort to reopen the record to make, for instance, to have a crankle hearing. And, indeed, there are avenues for post-conviction review, or there is an avenue for potential post-conviction review in an SVP case. Obviously not the traditional post-conviction motion because SVPs are civilly confined and have not been incarcerated in the sense meant by the post-conviction motion. But in any realistic form? Yes. The Supreme Court, the Illinois Supreme Court has held that under Section 2 backslash 1401, a Respondent in an SVP case can bring in an effective assistance of counsel claim in a collateral proceeding, which would allow for the development of the record. I think it would be a poor option to instead just presume prejudice because we don't know what, for instance, counsel's strategic choices were, or what evidence could have been adduced if counsel had done it. So, reaching the issue that was raised by Mr. Coyne in response to one of my questions, do you have a position as to what standard for plain error should be used? Your Honor, I don't have a position on that at this time. Because you're arguing that it wasn't raised. It was not raised. Yes, Your Honor. It has not been briefed by the parties. Although there was, as you know, a request for a new dispositional hearing, that was based on the claim of ineffective assistance of counsel and should be rejected on the basis that there was clearly no prejudice from the actions of counsel at that hearing. Additionally, I would Should it be briefed? Are you suggesting that that issue should be briefed? Your Honor, I don't believe it's necessary to brief that issue because it has never been raised. It is forfeited. And what's more, I think the Court's actions in this case were appropriate with regard to the dispositional hearing. And I think that's clear from the record and from the briefs that the Court already has. Obviously, if Your Honors would like more information, we're happy to provide it. I would like to briefly address some of the other points of error that counsel has alleged, if Your Honors will indulge me. Sure. Thank you. First of all, as to the failure to challenge the jurors in this case, as Your Honor pointed out, there's no case in Illinois that has ever found ineffective assistance based on the actions of counsel during a four-year because they're inherently strategic. Counsel has the opportunity to evaluate the demeanor of potential jurors and their responsiveness to questions, whether they understand English. And indeed, the Court found that these jurors understood English after examining them for several pages of transcript about issues like their education, their health, their family, their legal history, and their hobbies. The Court found in both cases that the witnesses understood English. No one disagreed with them, not the respondent, not the state. And indeed, the jurors themselves were given the opportunity to raise their hands. If they didn't understand any of the principles applicable to their jury service, neither of them did. So they understood English, and they understood what they were supposed to be doing as jurors. As to this misstatement in opening statement that respondent would testify, well, it's clear from the record that counsel was relying on respondent's representation that he wanted to testify. I'd refer Your Honors to the record at volume II, page 13, where counsel reported to the Court at a pretrial hearing just a few days before trial that his client was intending to testify. This Court has previously held in people V. Topps, 293L out 3D39, that it's not an effective assistance if that's what your client told you. I'd also point out that the jury was instructed that it should not consider the fact that the respondent did not testify. That argument didn't help one of our former governors. I think going into our former governors at this point might be ill-advised. But if you look at the record at C-72, that instruction was given. And at M-33. As to the screening evidence, first of all, evidentiary error or failure to object to evidence by an attorney only amounts to ineffective assistance if real justice was denied or the verdict resulted from the error. In this case, the verdict resulted from the substantial evidence that the people presented and not from a fleeting reference to the Illinois Department screening process. Additionally, there's no Illinois case that holds that this evidence is inadmissible. The cases from Wisconsin, Florida, and Kansas are very instructive. It would be highly helpful if the evidentiary issue itself were before this Court. But for ineffective assistance of counsel purposes, one can't say that counsel was ineffective for failing to memorize the law of other jurisdictions on an evidentiary issue and import it into this proceeding. And finally, as to the cross-examination of Dr. Arroyo, as I've already mentioned, that examination was quite effective. The only reason they're arguing otherwise is that there was a mention of the deposition in the transcript, which the people below took to be an attempt to impeach. Counsel explained that he never intended to impeach. Both the people in the Court accepted that representation, and the hearing proceeded. And indeed, there was nothing to impeach in that case, given the fact that Dr. Arroyo's testimony had been helpful to a respondent's case. So unless there are further questions, I ask that this Court affirm the trial court's disposition of this matter. Thank you. Thank you. I would just like to clarify a very few things. We are the new counsel that was appointed for Mr. Dodge after the notice of appeal was filed. We were not appointed to do his motion for a new trial. We were not appointed to do a motion to reconsider. We had no ability to draw up a new record, to put on evidence, to show anything at all. With regard to the condition of release hearing, the disposition hearing, cross-examination is manifestly different if you're trying to elicit what the proper placement would be when you're questioning a case. It may be counterproductive. It may indeed be counterproductive. The cases that counsel refers to are Teitelbach and Winterhalter. In both of those cases, which were interpretations of Section 40 and whether or not you can do an immediate disposition hearing, in both of those cases, that evidence came in during the trial. And an examination of those opinions will say that. So it was held to be not error because the Court did have that information. In this particular case, the record is absolutely clear. The trial court makes its finding based on two things. He says he's not in treatment. He's suffering from a mental disorder. That's all I need to know. And that's simply not what Section 40 asks for, rather commands that the Court consider. You argued that Jake Simmons' case also involved Judge McHale. We did. On a similar issue. With a Rule 23 disposition. That's correct. And I'm curious about the whole concept of the dispositional hearing being a whole separate thing than the trial. It needs to be a whole separate thing because there are different statutory factors that are required to be considered. And as Justice Epstein pointed out, the factors in Section 40 would be counterproductive to cross-examine on during a trial in front of a jury. Right. Okay. So if a judge says, okay, this is the dispositional hearing. I've heard everything at the trial, which is what the judge in our case did. That's correct. The problem with that, as we've pointed out, is that some stuff didn't get in at trial.  trial. And that the defendant, the respondent, was then having been promised an opportunity to do that by the judge, did not get the opportunity to do that. And the trial attorney didn't jump up and say, wait a minute, you promised you'd let us do this. That is our position. And your position is that that is ineffective assistance of counsel. It is ineffective assistance to recall to the trial court's attention that,  And additionally, as this Court knows, the Court has inherent authority to address structural error. Was there going to be a question? Yeah, I was going to ask you, I understand from what you just said that you didn't do the motion for new trial. Is there a reason that you didn't raise outside of the argument of ineffective assistance the purported failure of the Court to have this hearing? The tactical reason of not raising that was, as I mentioned before, the difference between the civil and the criminal standards of plain error. If we were to look at the civil standard, You don't get very far with that. We do not. And that's essentially what that decision is based on. The question is, although this is civil in nature, when the result is basically an incarceration and a deprivation of freedom, does that impact on what the standard would be? It should impact on what the standard should be. In fact, Samuelson from the Illinois Supreme Court clearly defines this as extended incarceration. But there has not yet been a decision that shakes that particular issue out. And you didn't want this to be the one? Without knowing the panel at the time, I thought that that would be ‑‑ I think we'll retire to think about that. Thank you. If you have nothing further. I'll just say to both sides, the briefs were wonderful, and so was the argument from each side. And if this is often the case, the briefs were assisted written in part by law students. Congratulations to them. Thank you, Judge. We are adjourned.